## CLARK v. SLICK OIL CO.

No. 9965—Opinion Filed April 25, 1922.

Rehearing Denied Jan. 2, 1923.

(Syllabus.)

1. **Contracts—Alteration of Written Contract—Statute.**

A contract in writing may be altered by a contract in writing or by an executed oral agreement, and not otherwise. Section 988, Revised Laws of Oklahoma, 1910.

2. **Same—By Executed Oral Agreement—Oil and Gas—Waiver of Delivery by Lessor.**

Where by the terms of a written oil and gas lease, the lessee agrees to deliver to the credit of the lessor, his heirs or assigns, free of cost in the pipe line to which the lessee may connect the well or wells, the equal one-eighth part of all oil produced and saved from the leased premises, and the lessor, without entering into a written agreement, waives his right to have the oil delivered in the pipe line and accepts settlement for the oil as it comes from the well or delivered in some other manner, this constitutes an executed oral agreement as to only such oil as he has accepted settlement for, by thus waiving one of the plain terms of the written contract, such lessor is not thereby precluded from demanding delivery of all oil in the pipe line that he has not accepted settlement for.

3. **Oil and Gas—Delivery of Lessor's Share of Production—Expenses—Construction of Lease.**

Under an oil and gas lease that provides that the lessee will deliver one-eighth of the oil to the lessor, free of cost in the pipe line, no part of the expenses of storage or providing storage tanks to let "cut oil" settle or be treated in order to make it marketable and acceptable to the pipe line is chargeable to the lessor. It is incumbent upon the lessee to furnish the necessary tanks to receive such oil.

4. **Conversion—Definition.**

Conversion is an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another to the exclusion of the owner's rights.

5. **Same—Failure of Lessee to Deliver Lessor's Share of Oil in Pipe Line.**

When by the terms of an oil and gas lease, it is incumbent upon the lessee to deliver the lessor's share of the oil in the pipe line, and he fails to do so, and the lessor demands the delivery of the oil in the pipe line, or settlement for the oil on the basis of its delivery in the pipe line, and the lessee fails, neglects, or refuses to deliver the lessor's share of the oil in the pipe line or make settlement on the basis of the oil delivered in the pipe line, this constitutes conversion of such oil by the lessee.

6. **Conversion—Measure of Damages.**

The measure of damages for the conversion of personal property, where the action has been prosecuted with reasonable diligence, is the highest market value of the property at any time between the conversion and the verdict, without interest, at the option of the injured party.

Error from District Court, Tulsa County: N. E. McNeill, Judge.

Action by E. M. Clark against the Slick Oil Company to recover for the conversion of royalty oil. Judgment for plaintiff for the amount defendant admitted to be due. Plaintiff appeals. Reversed and remanded.

Clark & Armstrong, for plaintiff in error.

Edw. H. Chandler, Summers Hardy, Wm. O. Beall, and T. J. Hanlon, for defendant in error.

MILLER, J. This action was commenced in the district court of Tulsa county by E. M. Clark against the Slick Oil Company, a corporation, for the conversion of certain oil by the defendant which was the property of the plaintiff. There is but little, if any, controversy about the facts in this case.

The Slick Oil Company was the owner of and operating an oil and gas lease on the east half of the southeast quarter of section 17, township 18 north, range 7 east, in Creek county, Okla. The lease was made on the 21st day of November, 1911, by Atwood W. Powell, as owner of said tract of land. Thereafter E. M. Clark acquired a 45/160ths. interest in said land and was thereafter entitled to 45/160ths. interest in all oil and gas royalty produced therefrom. The Slick Oil Company had knowledge of Clark's interest and right to the oil.

The lease was in writing, sealed, signed, and recorded; the material parts, which we may consider in order to determine this controvery, are as follows:

"In consideration of these premises said party of the second part covenants and agrees:

"1. To deliver to the credit of the first party, his heirs or assigns, free of cost, in the pipe line to which the party of the second part may connect the well or wells, the equal one-eighth part of all oil produced and saved from the leased premises."

It is admitted that a large quantity of oil had been produced from this land; that for a time the oil was sold and the Slick Oil Company had accounted to E. M. Clark for his share of the royalty and had paid him for it. It is also admitted that the amount of oil in controversy in this action is 20,201.46 barrels. In the petition of the plaintiff he states that this oil was worth $2 per barrel and that he is entitled to recover judgment for $40,402.92. The defendant contended that it owed the plaintiff $13,354.43, and no more, the difference being the price at which the oil is to be computed.

The jury returned a verdict in favor of the plaintiff for the amount admitted by the defendant, and judgment was rendered on this verdict. The plaintiff took all necessary steps to perfect this appeal to reverse the judgment of the district court. The parties will be referred to as they appeared in the court below.

Defendant in its amended answer states in part as follows:

"III.

"For a separate and further defense to plaintiff's petition, defendant, reiterating each and every allegation of its answers heretofore made in paragraphs one and two, the same as if the same were set out here at length, states, that on the first day of September, 1914, oil was discovered on the premises in controversy; that said premises were situated in what is known as the Cushing field, in the state of Oklahoma, and that at all times set forth in plaintiff's petition said field was producing oil in extraordinary and unforeseen quantities, and that during the year 1914 and a greater part of the year 1915, the flush production of oil from said field was of such extraordinary and unforeseen quantity that by reason thereof it was impossible to either find a market for or to procure a pipe line to transport the oil which was being produced from said premises and from said Cushing field generally. Defendant states that the oil wells which had been drilled on said premises from and after the first day of September, 1914, were producing large quantities of oil, and the same were not connected with any pipe line, and defendant was then unable to procure the transportation of said oil by a pipe line on account of said conditions existing in said field, and defendant says that on account of the matters and things alleged, it was unable to deliver the royalty oil produced from said premises to a pipe line, as stipulated and provided in said lease, and defendant says that on or about the first day of September, 1914, on account of said conditions then existing in regard to procuring transportation and a market for the oil produced from said premises, it was agreed and understood by and between plaintiff and defendant, that the defendant should receive and take said royalty oil and pay plaintiff for his interest in said royalty oil at the market price for said oil, said market price to be the price posted by the prairie Oil & Gas Company, and defendant says that from and after said last mentioned date, up to and including the first day of January, 1916, defendant took said oil according to said understanding and agreement, and from time to time paid plaintiff for his interest in said royalty oil under said agreement, the said market price therefor, and defendant says that plaintiff, at all times, accepted payment for said oil under said understanding

and agreement, and so continued to accept said payments, made as aforesaid, until during the month of September, 1915, but defendant says that after the month of September, 1915, plaintiff refused to accept payment, for the oil which had been received by the defendant, pursuant to the terms of said agreement aforesaid. Defendant alleges and states that by reason of its having received said royalty oil and plaintiff's interest therein, under the terms of said agreement, it is indebted to plaintiff in the sum of $13,354.43, which sum of money defendant has frequently offered to pay plaintiff, but which offers have been refused by plaintiff. Defendant says that said sum of $13,354.43 is the total market value of all royalty oil received by defendant from plaintiff for which payment has not been made by defendant to plaintiff, and defendant denies that any other or further sum is due plaintiff from this defendant, and defendant here and now offers to confess judgment for said sum of $13,354.43.

"IV.

"Defendant, for a further and separate defense to plaintiff's petition, reiterating its allegations in the above and preceding paragraphs the same as if the same were set out here at length, states that on and after the first day of September, 1914, that the oil wells on said premises were not connected with any pipe line, and that defendant was unable to procure their connection with any pipe line and was unable to run either its own or the royalty oil from said premises in any pipe line and was forced to store all of the oil produced from said premises, but that during all of said time defendant took and stored the royalty oil in which plaintiff claims an interest together with its own oil with the full knowledge of plaintiff, and from time to time, from said first day of September and up to the 23rd day of July, 1915, defendant paid plaintiff for his interest in said royalty oil the market price for said oil, which market price was at all times determined by the price for crude oil posted by the Prairie Oil & Gas Company, and defendant avers it to be true that by said course of dealing between the parties that said lease contract as to delivering plaintiff's oil to a pipe line was modified and changed so that it became and was the agreement between the parties that the defendant would take all of the royalty oil from said premises and pay to the owners thereof a price equal to the price posted by the Prairie Oil & Gas Company for crude oil, and defendant further avers it to be true that plaintiff having accepted the payments aforesaid for his oil, with full knowledge of the fact that defendant itself was taking said oil and with the full knowledge of all the facts and circumstances concerning the conditions surrounding the production of oil from said premises, as aforesaid, that the plaintiff is now estopped from claiming that said contract now, or since the first day of September, 1914, is otherwise than as established by the course of dealing between the parties.

"V.

"Defendant, for a further and separate defense to plaintiff's petition, reiterating its allegations in the above and preceding paragraphs the same as if the same were set out here at length, states that the lease designated as Exhibit A to plaintiff's petition, among other things, provides that the lessee is 'to deliver to the credit of first party, his heirs or assigns free of cost in the pipe line to which the second party shall connect its well, one-eighth part of all oil produced or saved from leased premises;' but defendant specifically denies that said provision is any longer a part or parcel of said lease agreement or that said provision is now or has been at any time since the first day of September, 1914, binding upon or in force between plaintiff and defendant, but defendant avers it to be true that at all times since said first day of September, 1914, said provision aforesaid has been superseded by the agreement and by the course of dealing of plaintiff and defendant as aforesaid as to said oil produced from said premises, so that it is and was the understanding and agreement of the parties that from and after said first day of September, 1914, that the defendant would take and receive all of said royalty oil and pay to plaintiff therefor for his interest therein the market price according to the posted price of the Prairie Oil & Gas Company for crude oil in the Mid-Continent field."

It is unnecessary to quote the remaining parts of the answer. We now quote of the opening statement of the defendant:

"But now what was done as far as Mr. Clark was concerned in this case? After this oil had been running a short while, salt water got into the wells and this oil began to be produced as filled with water and with mud; in other words, it is what we would usually call cut oil. It was oil, if there had been a pipe line which could have handled it, no pipe line would have taken. There was only one thing to do with it, and that was to put it off in a tank some where and treat it.

"Nobody in that field except the Slick Oil Company seemed to be able to take care of their royalty owners, by reason of the fact that the Okla Oil Company, a company in which Mr. Haskell was interested, as he was interested in the Slick Company, had a large amount of tankage; the Slick Company made an arrangement with the Okla Company by which this cut oil was run into storage and allowed to settle, and when it was settled, the Okla Company bought it from the Slick Company, all the oil, the royalty owners' oil and the Slick Oil Company's portion of the oil. In other words, by this arrangement which was made with the Slick Oil Company, the royalty owners on this piece of land were receiving every day

the market price for every barrel of oil that was being produced from those wells, when the royalty owners on adjoining lands were not getting any return whatever.

"Now, did Mr. Clark know about this? did he raise any objection at that time and say, 'I want my oil?' The evidence will show that he never at any time said, 'Gentlemen, here is the contract, and I am entitled to my oil.' He had no place to put it upon this earth. Instead of that, he comes to Mr. Haskell, he comes to Mr. Hane, and congratulates them upon the fact that they had been able to save this oil for him and for themselves. He expressed entire satisfaction with the arrangement which had been made.

"Now, you do not need the oral express agreement of the parties as to that; if not a word had been said, here is a check and here is a voucher which was sent to Mr. Clark and which he accepted, and he cashed the check showing that this oil had been run to the Okla Oil Company, without an objection as to how it was paid for or the manner in which it was handled.

"Now, that brings us up to July 31, 1915. During all this time, Mr. Clark had been growing richer and richer by reason of the efforts of the Slick Oil Company to preserve his oil for him and for themselves and never a word of complaint that they had violated this contract. Mr. Clark goes on about his business, and after July 31st, the Slick Oil Company continued up until August 17th to run this oil to the Okla storage assuming, as they had a right to assume, that it was agreeable to Mr. Clark, because he had expressly said so and because he had accepted the money for the oil, knowing how it was being handled: up until September 9th, Mr. Clark never, by word or act, indicated an unwillingness that this contract be performed as it was performed, but during the latter part of August and September this great flood of oil was beginning to subside to a certain extent; additional pipe line facilities had been laid to take care of it; additional tankage had been made; the price of oil started to advance and then when the check was sent to Mr. Clark in September was the first time that he ever raised an objection to the way that the oil was handled. He did not object then to them taking the oil, but he objected to the price that he was paid for it. In other words, when times were hard, when this oil was being saved for him, at the expense of the Slick Oil Company, without a dollar of expense to him for storage, it was perfectly agreeable to him; but when times got good Mr. Clark in the meanwhile had acquired larger and larger interests and he wanted more and more, and he says, 'I don't want to settle now according to our contract. because you run some of this oil about the first of August when oil was

forty cents and you put it in storage. It is true, I accepted that price that we agreed on, but at that time oil was not worth sixty and sixty-five cents for all the oil which you took, whether when you took it it was forty cents or sixty-five cents.' Now, that was what started the row between these parties.

"Now, the Slick Company took this position, that 'Mr. Clark, by your acts and by your talk and by your express agreement, you have agreed with us that this contract should not be performed, as it was originally written between the parties and therefore we do not intend to pay you except according to our agreement.' Now, my friend, Mr. Devereux, will tell you that during the months of September and October and November that we tried to pay Mr. Clark after oil had gone up sixty and sixty-five and seventy and eighty cents, tried to still pay him forty cents. The proof in this case will show you that Mr. Clark was sent a check at the end of every month, September, October, November, and December, 1915, not for forty cents, but for the posted market price on the oil on every single day when every single barrel was run in the storage and when oil reached the price of eighty cents and a barrel of it was drawn out of these wells, Mr. Clark was credited with eighty cents for his portion of the barrel which came out of the well. That is the fact and the testimony in this case will show you that there can be no dispute whatever about it.

"Now, for September this oil was run, and along about the first of October a statement was sent to Mr. Clark and a check; this was not a case in which they took his oil and did not want to pay for it: a check was sent to Mr. Clark for the oil which had been run, and for which he had not been paid up until September or during the months of September and August, not at forty cents, but his value of this oil being figured every day, whenever the market advanced he was credited with the advance exactly like the agreement between the parties was. Mr. Clark kept the check, he did not return it. He wrote a letter on October 4th, which will be in evidence in this case, in which he still made the claim that he was not receiving enough for his oil, but he never made the claim up until that time that they had no right to sell the oil, his only contention then on Oct. 4th, as shown by his own letter being that we had not paid him enough for it. It is true in this letter he sort of hinted that we might not have had a right to sell his interest, but when you read the letter, you will see that this letter of October 4th is a complaint that he was not receiving enough money for his royalty oil.

"Now, in October, 1915, again we run this oil to the storage of the Slick Company, just exactly as he had agreed we might run it,

and at the end of October or November we again sent Mr. Clark a statement showing the amount of oil that was run and showing the exact amount which had been paid for, every barrel, and showing that he had been credited with every advance in the market. Mr. Clark kept this check, at least it hasn't been returned to us. He didn't notify us that he was not going to cash it, but as far as he is concerned today, he can walk down to the bank and cash the check and put the money in his pocket. About that time oil kept going up and up over a dollar before he goes to an attorney and, for the first time, Mr. Clark then contends at the consultation of counsel that he wants this contract enforced, that he wants his oil in kind. -Now, what was his position? It was admitted by counsel, who stated this case to the jury, that he never made any arrangement to take this oil until December, 1915. Along in December, 1915, he began to make arrangements with the National Refining Company to take this oil, in the meantime making charges and counter charges and claims and claims against this company and annoying them and harassing them by reason of the fact that he was then unwilling to abide by the contract which had been of such great benefit to him during the period of distress and adversity in this oil field. He then makes an arrangement in December with this refining company, and the testimony will show that as soon as the refining company was capable of taking care of the oil, the company said, 'All right, you just keep objecting about your payments; go ahead, if they will take the oil and pay you for it, we will give it to you.' So they gave it to this refining company in January. Up until January there had never been a day when if this oil had been tendered to Mr. Clark, he could have taken it; never a day when Mr. Clark had a tank on this property to receive the oil or a pipe line on the property to which it could be run; never a day that he offered to provide any means for taking care of the oil.

"It is true that it was our duty to run the oil and not let it go to waste. If we had run it, that is the only way we could have run it, and I think when the testimony is in in this case, that it will show you that the contentions that were being made by Mr. Clark in the fall of 1915 when oil had advanced greatly in price, were not made in good faith for the purpose of taking this oil, but were made in order to take advantage of a technical statute in this state and to found an action by which, when he brought a suit, if he could have maintained it, he would recover not the value of the oil, which any man ought to be satisfied with, but by which he could take advantage of any increase in the price of oil provided it increased up until the day that the case was tried. Now, that is going to be the case."

Defendant seems to be laboring under the impression that, because an emergency or extraordinary conditions arose and Mr. Clark was willing to accept a settlement for his royalty oil under different terms or conditions than those specified in the written contract, he thereby forever waived his rights under the written contract. The terms of the contract were plain and unambiguous. This is not a case where there is room for doubt in construing the provisions of the contract and the parties have construed it themselves by certain acts and dealings. Under such circumstances, the construction placed on the contract by the parties will be considered by the court as the real intent of the parties. The plaintiff was only bound to accept the settlements on this basis so long as it was agreeable to him. The fact that he makes a settlement for certain "oil runs" on a different basis than that provided for in the contract does not preclude him from demanding a settlement under the terms of the written contract on any subsequent "oil runs" that he has not already accepted settlement for. Having declined to accept further settlements on this basis and demanding of the company that the terms of the lease govern the settlement, it was the duty of the company to make settlement in accordance with the terms of the written contract.

Section 988, Revised Laws of Oklahoma, 1910, reads as follows:

"A contract in writing may be altered by a contract in writing, or by an executed oral agreement, and not otherwise."

This section of the statute determines the rights of the parties in this action.

"An oral agreement which alters an agreement in writing is not valid or binding unless such oral agreement is executed: and proof of its existence is not competent to vary the terms of a written instrument." Page v. The Geiser Mfg. Co., 17 Okla. 110, 87 Pac. 851.

"An oral agreement which alters an agreement in writing is not valid or binding, unless such oral agreement is executed, and proof of its existence is not competent to vary the terms of a written instrument." Neverman v. Bank, 14 Okla. 417, 70 Pac. 334.

"A written contract cannot be altered except by a contract in writing or by an executed oral agreement." Halsell et al. v. Renfrow and Edwards, 14 Okla. 674, 78 Pac. 118, 2 Ann. Cas. 286, 202 U. S. 287, 50 L. Ed. 1032; Brown et al. v. Coppadge et al., 54 Okla. 88, 153 Pac. 817.

Smith-Wogan Hardware & Implement Co. v. Moon Buggy Co., 26 Okla. 161, 108 Pac. 1103, is distinguished from the foregoing cases for the reason that in this case there was a new consideration for the oral agreement. Paragraph 1 of the syllabus reads:

"At any time after a written contract has been entered into the parties may orally, on a fresh consideration, vary or abrogate it; or they may substitute for it a new written one."

Before this action was instituted and on November 19, 1915, Honorable James A. Veasey, acting in behalf of the defendant, wrote a letter to Honorable Bird S. Mc-Guire, attorney for the plaintiff, which letter was attached to plaintiff's petition as Exhibit B and is as follows:

"Nov. 19, 1915.

"Dear Mr. McGuire:

"Referring further to the controversy between Mr. E. M. Clark and the Slick Oil Company, we understand Mr. Clark's contention to be that he is entitled to his proportion of the royalty oil in kind, our contention being otherwise.

"We are further advised by you that you contemplate an action for conversion, or an action to require us specifically to deliver this proportion of the oil to Mr. Clark. in kind.

"We therefore tender you the further production of this property, belonging to Mr. Clark's royalty interest, and, in the same connection, will also deliver to Mr. Clark sufficient barrels of oil to cover the number of barrels run in the past and for which he has not accepted settlement. As you know, there is a considerable quantity of crude oil produced from this property, and Mr. Clark will have to make immediate arrangements for sufficient tankage or other facilities to handle his proportion of the oil and to settle the oil in such way that the cut oil can be separated from the good oil. What we have said about arrangements to handle the cut oil is suggestive, merely, as we assume no purchaser will take the oil from Mr. Clark until this is done. Please advise us when Mr. Clark. is in position to receive this oil from us."

Mr. McGuire's answer to this letter is attached to plaintiff's petition as Exhibit C, and is as follows:

"Dear Sir:

"Answering your letter of some days ago, in which you proposed in substance to deliver to E. M. Clark barrels of oil in kind equal to the number of barrels covered by the two checks which you have heretofore sent Mr. Clark, and which he refused to accept, one being for $5,105.67 and the other for $1,615.57, and that in ad-

dition thereto to deliver any other back royalty oil now due him; and that you will deliver all future oil which may · be due him in kind I have the honor to state that Miss Clark, daughter of E. M. Clark, has directed me to accept the terms provided in your letter; of course, with the understanding that in delivering back oil and oil for the future, that Mr. Clark would not receive more than his share of what is termed 'cut oil,' if any such oil there should be."

These letters are a part of the pleadings and show conclusively that the plaintiff refused to make further settlements, except under the terms of the written contract. The defendant admits these letters and refers to them in the seventh paragraph of its answer as follows:

"VII.

"Defendant, for a further and separate defense to plaintiff's petition, reiterating its allegations in the above and preceding paragraphs the same as if the same were set out here at length, denies that the writings shown as Exhibits B and C to plaintiff's petition constitute or ever constituted a contract or agreement between the plaintiff and defendant by which the defendant agreed to deliver to plaintiff the oil in controversy in kind, but it avers it to be true that said Exhibit B was, and at the time was intended, to be an offer to compromise the differences between the plaintiff and the defendant about the matters and things involved in this cause of action, and defendant says that said writings constitute no agreement between the parties for the reason that the proposition made in Exhibit B was never accepted by the plaintiff or by any person authorized by plaintiff to accept the same, before it was withdrawn by the defendant, and defendant says that the writing designated Exhibit C to plaintiff's petition was not in good faith an acceptance of the offer made in Exhibit B, for the reason that at the time the plaintiff had no facilities to receive the oil if the same should have been delivered to him, and plaintiff well knew that he was and would be unable to receive said oil, and that its delivery to plaintiff would be an impossibility by reason of the fact that plaintiff had no tanks or other facilities for receiving the same on said premises."

It was not incumbent upon the plaintiff to furnish storage tanks to receive and care for this oil. Under the contract it was the duty of the defendant to care for the oil until it was delivered in the pipe line. and there is where the plaintiff was entitled to have it delivered. It was not necessary for the plaintiff to treat his part of this oil and make it marketable so that the pipe line companies would receive it.

Neither was he required to provide storage tanks in which to let the "cut oil" settle. It was just as much a part of the duty of the defendant under the contract to prepare this oil for market so that it would be received by the pipe line company as it was its duty to pump the oil from the wells or drill the wells. The plaintiff, had a right to demand his oil delivered in the pipe line, and the defendant's duty was not discharged until it was so delivered.

Under the Veasey letter, Exhibit B, and the paragraph of the amended answer last above quoted, the defendant admitted it had plaintiff's oil. By other parts of its answer and the opening statement, it admitted it had never tendered plaintiff the amount of money due him for the oil when delivered in the pipe line. This amounted to a conversion of plaintiff's oil on the part of the defendant.

"Where a party to an action makes a solemn admission against his interests in a pleading, in the absence of mistakes on his part or on the part of his counsel who inserted them in such pleadings, a court, in passing upon the sufficiency of a subsequent amended pleading filed by him, should take such admissions into consideration and treat them as admitted facts in the case. In the original answer it was admitted that the Geiser Manufacturing Company sold one Johnson certain threshing machinery, upon the condition that Johnson obtain a note from one Page to be used as a part of the purchase price; that Page executed and delivered his note to Johnson for that purpose upon Johnson's verbal agreement to thresh Page's grain, at the customary price, in an amount equal to the face of the note. In the amended answer it was alleged, as a defense, that Johnson failed to perform his part of the contract, and that therefore the note was given without consideration. Held: That Page cannot, because of Johnson's default to him, escape his liability to the company; and that, in view of the admissions made, a motion for judgment on the pleadings was properly sustained." Page v. The Geiser Mfg. Co., 17 Okla. 110, 87 Pac. 851.

In the following cases conversion had been held to be—"Any distinct act of dominion wrongfully exerted over another's property in denial of or inconsistent with his rights therein": Danciger v. Isaacs, 82 Okla. 263, 200 Pac. 164; Probst v. Bearman, 76 Okla. 71, 183 Pac. 886; McClintock v. Parish, 72 Oklahoma, 180 Pac. 689; Mercantile Co. v. Fitch, 22 Okla. 475, 99 Pac. 1089; Bilby v. Jones, 39 Okla. 613, 136 Pac.

414; Nat'l Bank of Commerce v. Jackson, 69 Oklahoma, 170 Pac. 474.

A motion for judgment on the pleadings and opening statement of counsel in favor of the plaintiff would have been properly sustained, except for the fact that the value of the oil had to be determined. In other words, by applying the law to the facts admitted by the defendant in its answer and opening statement, the plaintiff was entitled to recover. Therefore the only issue in this case was the value of the oil. The measure of plaintiff's damage is defined by section 2875, Revised Laws Oklahoma 1910. This was covered by instructions Nos. 8 and 9 by the court, which are as follows:

"No. 8. You are instructed that where one party converts the property of another to his own use, the detriment caused by the wrongful conversion of the personal property is presumed to be:

"First: The value of the property at the time of the conversion with interest from that date; or

"Second: Where the action has been prosecuted with reasonable diligence, the highest market value of the property at any time between the conversion and the verdict, without interest, at the option of the injured party.

"You are instructed that in the case at bar the plaintiff has elected and exercised the option of accepting as his damage the highest market value of the property at any time between the time the same was converted and this date, without interest.

"The court further instructs the jury that by agreement of the parties to this action the question of whether this action was instituted and prosecuted with reasonable diligence was left to the determination of the court. The court charges the jury that it has found under the evidence that this action was instituted and prosecuted with reasonable diligence.

"No. 9. You are instructed in this case that it is agreed by and between the plaintiff and defendant, that the plaintiff is the owner of certain interest in land and the court instructs you that under and by virtue of said agreement plaintiff is the owner of 45/160 part of one-eight of all oil produced from the premises described in plaintiff's petition.

"You are therefore instructed that if you believe from the preponderance of the evidence that the defendant produced from said premises oil and failed, neglected, and refused to deliver the same to the pipe line and then failed, neglected, and refused to deliver the same to the plaintiff, but converted the same to the use of said de-

fendant, then your verdict should be for the plaintiff and against the defendant for the value of all oil converted by the said defendant, and the value of said oil is to be determined at the highest market value thereof at the time between the conversion and the verdict."

The plaintiff requested the following instruction which was refused by the court:

"That if the jury believe from the evidence that the defendant was the lessee in an oil and gas lease of which the plaintiff, E. M. Clark, was the lessor, as to a certain part of the oil, and in which lease it was provided that the lessee should deliver one-eighth of the oil to the credit of the lessor, free of costs in the pipe line to which the lessee should connect its well, then the court charges you that the plaintiff was the owner of the oil sued for in this action, to wit: 20,201.46 barrels."

This instruction should have been given under the admission of the defendant in his answer, opening statement, and the Veasey letter. The court committed error in refusing to give this instruction.

The jury should have been instructed to find the highest market price of the oil, under instructions Nos. 8 and 9, and this was the only question for their consideration.

The plaintiff in error complains of certain instructions given by the court, but, as this case will have to be reversed, it will not be necessary to consider the other instructions complained of, as any error predicated upon them will probably not occur again.

HARRISON, C. J., and KANE, ELTING, and KENNAMER, JJ., concur.

---

JOHNSON, J. (dissenting). I cannot agree with the opinion of the majority of the court in reversing the judgment in this case. My conclusion is that the judgment should be affirmed. My reasons therefor follow:

The record discloses that the controversy grew out of substantially the following facts: That the plaintiff is now, and was at the times stated, the owner of 45-160 interest in the land described in the petition of the plaintiff with all the oil and gas royalties produced therefrom; that prior to his purchase of said land an oil and gas mining lease had been executed upon the same by the owner, one Attwood Powell, to Thos. B. Slick and B. B. Jones, and by various assignments the defendant, Slick Oil Company, acquired said oil lease and operated the same and obtained large quantities of oil therefrom. The controversy involved is over one-eighth royalty in the oil produced from the premises during the months of June, July, and August, 1915, for which settlement has not been made. The number of barrels thus run was 10,869.93, which, at the posted market price during these months, amounted to $5,105.67. There is no controversy between plaintiff and defendant as to the number of barrels of oil for which settlement has not been made during this period, the only controversy being as to the amount due, and there is no controversy that the amount stated is not a true and correct amount when calculated according to the posted market price; the only contention being, in effect, that during said periods of time and the succeeding months oil was bringing a premium over and above the posted market price, and that the plaintiff was entitled to receive compensation for his oil in accordance with the premium above the posted market price.

The record further discloses that during the month of September the number of barrels was 2,059.57, of the value of $1,615.57; for October the number of barrels was 2,816.62, of the value of $2,253.29; for November, 2,725.11 barrels, of the market value of $2,449.08; December, 1,730.77 barrels, of the market value of $1,830.82. The number of barrels produced during these months added to those produced during the months of June, July, and August gives a total of 20,201.46, being the exact amount for which plaintiff sues, and the total market price of $13,354.43, being the exact amount which defendant tendered the plaintiff and for which verdict and judgment was rendered in plaintiff's favor, and for which several amounts during these months the defendant had mailed its checks to the plaintiff in the usual course, and which checks were received and retained by plaintiff and were in the possession of his attorney or himself at the time of the trial. Of this there is no dispute in the evidence.

The lease contained the usual provision that the lessee should deliver to the lessor, his heirs or assigns, free of cost in the pipe line to which the party of the second part might connect the well or wells, the equal one-eighth part of the oil produced and saved from the leased premises. It is the contention of the defendant, as set out in its answer, that there was a waiver of that provision of the lease which provided for delivery of the royalty held to the credit of plaintiff in the pipe line, by an agree-

ment between the parties; that performance thereof might be made in a different manner from that stated in the written lease. This was the sole issue submitted to the jury.

Evidence was offered to show that such an agreement had been entered into and had been performed by defendant paying to the plaintiff the posted market price of one-eighth of the oil produced, and that plaintiff had thus accepted performance without objection until oil began to command a premium over and above the posted market price, at which time the plaintiff sought to withdraw from the arrangement. Upon this point the evidence is as follows:

Plaintiff testified on cross-examination:

"Q. You know from the first of June, 1915, up until the first day of January, 1916, that the Slick Oil Company was not delivering you the oil from day to day as it was being produced, did you not? A. They never did deliver me any from day to day; it is not now. Q. Isn't it a fact that they never did deliver you any oil from the first day of September, 1914, up until the first day of January, 1916? A. No, they didn't deliver me any oil. I didn't ask them to. Q. They paid you for the oil every month didn't they, up until the 1st day of September; when you got your check in September they had paid you for the oil produced every month? A. I don't know about every month; they sent me a check occasionally at what I understood to be the market price value of the oil at the time they sent it, and I accepted the check, now, if that is what you mean. Q. And you made no objection to the fact that they did not deliver you the oil until—— A. Because they were paying me the full market price for the oil at that time, and I accepted it and supposed that was a contract of selling so many barrels."

The witness C. E. Hane testified on direct examination as follows:

"Q. Now, this cut oil that you speak about, what kind of oil is that? What do you mean by cut oil? A. Well it is oil that is cut by the action of a little water with a large amount of gas mixing with the oil. Q. Any mud in it? A. Sir? Q. Any mud in it? A. I presume there is some. Q. Sand? A. Sand. Q. Will pipe lines take or run oil of that kind? A. No, sir. Q. Now, when the pipe line disconnected from this well, what did you do with this oil? A. There was a pipe line laid from the Powell property to a tank farm southeast about two to three miles and the oil was run through that line to tanks of the Okla Oil Company. Q. Who laid that line? A. The Okla Oil Company. Q. For what purpose? A. To handle the oil from the Powell property. Q. To where? A. Steel tanks on the Blackwell farm. Q. Did the Okla Oil Company have any large amount of empty storage at that farm? A. Yes, sir. Q. When they started to taking the oil, did you have an arrangement with them about the oil? A. The Okla Oil Company as an interested party in the Slick Oil Company took it up with their associates in the Slick Oil Company. Q. What arrangement was made? A. The arrangement was made— Judge Devereux: I object to that. How is that binding upon us? Here is two companies that are so interlocked, you cannot tell which is which. Judge McClain: I am going to ask the witness Mr. Clark's knowledge of it just as soon as I can establish the fact there was anything to show his knowledge. The Court· Overruled. Judge Devereux: Exception. Put in 'incompetent, irrelevant and immaterial.' so as to assert the statutory ground. A. An agreement was made for the Slick Oil Company to handle the oil in that manner. Q. Was the Okla Oil Company to buy the oil? A. Yes, sir. Q. How was it to be accounted for? A. It was to be accounted for at the market price in effect on the date of runs after it had remained in steel tanks sufficiently long for the cut oil to settle to the bottom. Q. When was it to be paid for? Judge Devereux: I object to that; that cannot affect us, and it is incompetent, irrelevant and immaterial; how these interlocked companies were to pay each other certainly cannot affect the plaintiff in this case. Judge McCain: I am going to show by this witness that all of Mr. Clark's oil. all of it, was run here, and when it was to be paid for, and that we paid Mr. Clark for it, according to our agreement. and that the witness talked to Mr. Clark. The Court: Overruled. Judge Devereux: Exception. Q. When was the Okla to pay for the oil? A. When the oil had settled out; when the cut oil had settled out in the tanks. Q. Then. as I understand you, the agreement was that the Okla Company would take the oil and pay for it at the market price on the day it was run into storage. A. Yes, sir. Q. But they would not pay for it until it was settled so they could determine the amount? A. Yes. sir. Q. Now, how was the market price to be determined? A. The market price to be determined? A. Yes. Judge Devereux: Just to save the record, I want to object to that, as incompetent, irrelevant and immaterial. The Court: Overruled. Judge Devereux: Exception. Q. What do you mean by the posted market price? A. The price. posted by the Prairie Oil & Gas Company. Q. I will ask you what is meant in the oil fields when you speak of the posted market price of oil? What is the meaning of that expression among oil men? A. The posted price as paid by the Prairie and other purchasers of oil. at the price as posted by the Prairie Oil & Gas Company. Q. Is the price that is posted by the Prairie Oil & Gas Company invariably the prevailing price for oil? A.

Yes, sir. Q. In the Mid-Continent field? A. Yes, sir. Q. Now, did you see Mr. Clark at any time along the latter part of May or the first of June? A. Yes, sir. Q. Now, where did you see him? A. In the Slick Oil Company's office. Q. In Tulsa? A. In Tulsa. Q. Now, about how many times did you see him along about that time? A. Mr. Clark called frequently; I presume he was at the office six or a dozen times. Q. How long after this cut oil started to be produced on the premises would you say it was until you saw Mr. Clark? A. Ten days possibly. Q. Now, how long after this oil commenced to be run into the Okla storage for the Okla. Company was it, would you say, until you saw Mr. Clark, as near as you can remember? A. It must have been a few days. Q. Now, in addition to seeing him personally, did he telephone you? A. Yes, sir. Q. How frequently? A. I talked to Mr. Clark, or he, rather, called me half a dozen times. Q. Now, the first time that you saw Mr. Clark after this oil begun to be run to the Okla storage, did you have any conversation with him about what was being done with the oil and how it was being handled? A. Yes, sir. Q. Now, state to the jury the substance of your conversation, as near as you can recollect it? Judge Devereux: We object to that as incompetent, irrelevant and immaterial, because it is an attempt to prove a sale of the oil in controversy without a writing and by parol in contravention of the statute of frauds, and because it is an attempt to vary a written contract by an unexecuted parol conversation. The Court: Overruled. Judge Devereux: Save an exception. A. Well, Mr. Clark called up the office to learn as to the approximate production and ask how it was being handled, and I explained it to him. Q. Did you tell him about the character of the oil? A. Yes, sir. Q. How did you explain it to him? Just tell the jury as near as you can remember the conversation you had with him, the substance of it, with Mr. Clark. Judge Devereux: Just to save the record I want to object as incompetent, irrelevant and immaterial, and for the reason set out in the objection to the last question. The Court: Overruled. Judge Devereux: Exception. A. He didn't at first understand why the oil should be cut; it was then explained to him what caused cut oil, the action of the water with the high gas pressure, and we explained to him that possibly a half barrel of water would ruin two or three thousand barrels of oil. He then wanted to know how the oil was being handled, and we explained with reference to letting it run to the tank farm and that we had a number of empty steel tanks. Q. You say 'we'; always speak of the company that you are talking about, as you are representing two companies. Judge Devereux: Of course, if he did talk to Clark, he is telling a conversation now, if he told Mr.

Clark which company he was talking about. Judge McCain: He is giving the substance of it; he is not purporting to give the identical conversation. Judge Devereux: If he told Mr. Clark that he could tell, he meant such a company. Let him give the substance of it. Q. Tell what was said. A. It was explained to Mr. Clark that the Slick Company was—had arranged for the Okla to purchase and run the oil to the steel tanks on the Blackwell farm. Q. Now, was anything said to Mr. Clark about how this empty storage happened to be there? A. Yes, sir. Q. Now, what was told him about that. A. It was explained that there were a number of empty steel tanks, of 55,000 barrel capacity, on the Blackwell tank farm, and it was the intention for the Okla in the purchase of the cut oil from the Slick Company it would be settled when it had settled out and the cut oil had settled out, it would be run to these tanks. Q. Now, did you say anything to him about how the Okla was to pay for the oil? A. He asked the question how it was being paid for. Q. What did you tell him? A. At the market price as in effect on the date of the run and the payment to be made when the oil had settled out. Q. What did he say to that? A. He was very much pleased. Q. What did he say? Did he express himself in any way? A. He said it was very fortunate, he thought, that the Slick Oil Company had parties interested in the company that had their own steel tanks, and it was a happy coincidence that the empty tanks were there in which to store the oil."

The witness Frank Haskell testified, on direct examination, as follows: When the wells were drilled deeper that there was a maximum production of 20,000 barrels per day from three wells. Within less than a week after the first well was brought in they began to produce what is known as cut oil, which is caused by water coming in under terrific gas pressure, thus making the oil unmarketable; some of the worst of it was settled in tanks on the farm and the balance was run into the steel tankage of the Okla Oil Company and permitted to settle. This process took from weeks to months, and the water and bad oil would settle to the bottom of the tank leaving the oil on top. This witness further testified:

"Q. Mr. Haskell, did you have a talk with Mr. Clark about this oil being put in this Okla storage? A. After we had been doing that a short time, we did. Mr. Clark came in and was very much pleased, and so expressed himself, as to the way the matter was being handled; we were saving all the oil and other people who had it were wasting a lot of it. Q. About what time was that? A. Well, the only way I could establish that was to refer to the time we had this large production, and that was in —the largest along about the middle of

May, and it continued large for some time; I would say it was in May and June, Mr. Clark was in our office at various times. Q. Now, in the conversation you had with Mr. Clark, about the oil, did he at any time express any dissatisfaction with the way you were handling his royalty interest in the oil? Judge Devereux: We object to that as incompetent, irrelevant and immaterial to any issue in this case, whether he was satisfied with the way they were handling it. The Court: I think you had better tell the way he said, what he said, or the substance of what was said, and then the jury can tell whether he was satisfied or not. Q. Say to the jury, give the substance of what he said on his visit or visits to you? A. Well, I can only give the tenor of it, and not the wording. We had, much to Mr. Clark's surprise, and our own, developed a very large production there and were taking care of it, when other productions of similar nature were being wasted. Judge Devereux: I move to strike that out, it is not in answer to any question. The Court: Tell what was said, the substance of it. Q. What was the substance of your conversation with Mr. Clark? A. He gave me to understand he was very much pleased with the way the matter was being handled and congratulated himself in having to deal with a company who was able to do it as well as we did."

The witness Hovis testified:

"Q. Do you know Mr. Clark? A. I do. Q. When did you first get acquainted with him? A. Well, I met Mr. Clark when he came into the office, the Slick Oil Company's office along about the spring of 1915, early in the spring. Q. Do you recall the period of time when the big wells on this property came in? A. Yes, sir. Q. Did you see Mr. Clark at that time or shortly after that time? A. I believe he was in the office shortly after that time. Q. Who else was there besides Mr. Clark? A. I remember one occasion Mr. Hane was in there. Q. Did Mr. Clark and Mr. Hane have any conversation in your presence about the handling of the royalty oil from this property? A. Well, we were discussing the question about the disposition of the oil, and it was talked over— Q. Give the jury the substance of that conversation about the oil. A. Well, the substance of the conversation was that the oil was being run— the biggest bulk of it, at that time to the Okla Oil Company, and I remember that Mr. Clark asked upon what basis settlement would be made, and Mr. Hane said upon the basis of the price in effect at the date of the runs. Q. What did Mr. Clark say to that? Judge Devereux: We object to that, now, as being incompetent, irrelevant and immaterial, and because it is an attempt to change a contract by parol, a written contract by parol, and also because the evidence is inadmissible under the statute of frauds. The Court: Overruled. Judge De-

vereux: Exception. Q. Was anything said about the price should be paid on the day it was run? A. It was understood it was to be the posted Prairie price."

The majority opinion sets out paragraphs 3, 4, and 5 of the defendant's amended answer, showing that the defendant pleaded as a defense, in effect, that there was an agreement aquiesced in by the plaintiff that the oil might be stored until it settled, and then to be sold at the posted market price as run into storage, and settlement made on that basis. As heretofore stated, this was the sole issue. This defense was submitted to the jury by the trial court in paragraphs 10 to 13, inclusive, of the court's instructions to the jury. The court's instructions were full and complete, consisting of 19 separate paragraphs, most of which are quite lengthy. Paragraphs 1, 2, and 3 thereof define the issues between the parties. Paragraphs 4, 5, 6, 7, 8, and 9 submitted to the jury the plaintiff's theory of the case. These paragraphs were full and complete, and submitted the plaintiff's theory clearly and explicitly to the jury. Paragraph 10 of the court's instructions was as follows:

"You are further instructed that the burden of proof is upon the defendant to prove the material allegations of its answer after the plaintiff has produced his lease and the parties have agreed that there are 20,201.46 barrels of oil that the plaintiff has not accepted pay for, then the burden shifts to the defendant to prove a different contract and agreement than that stated in the lease."

Paragraphs 11 and 12 of the court's instructions advised the jury of the rights of each of the parties under the agreement pleaded by the defendant as a defense, that the oil should be stored, sold, and settled for in a manner different from that provided for in the lease; and paragraph 12 authorizes the jury to find in favor of the defendant in the event the jury believes from a preponderance of the evidence that the defendant was unable to deliver the oil to the pipe line either by reason of the overproduction of the Cushing field or by reason of the quality of the oil, and, acting in good faith under such conditions, the defendant, for the purpose of protecting and saving the said oil, entered into an agreement with the plaintiff, consenting that the defendant might place said oil in storage tanks for the purpose of permitting the same to settle and become marketable, and that after the same settled the defendant was to sell said oil or pay the defendant for his portion of the oil stored at the posted market price at

the day the same was run into storage tanks, and if the jury should further find and believe that any such agreement was entered into, and after said agreement was entered into the defendant, acting upon such agreement, stored said oil, that, in effect, said agreement would bind the parties until such time as the plaintiff notified the defendant that the further storing and disposing of said oil under such terms would not be satisfactory and that the plaintiff desired his oil to be delivered to him.

I think the instructions of the court were full and a fair statement of the law applicable to the issues made by the pleadings of the parties and the evidence offered upon the trial; and that the testimony offered by the defendant hereinbefore set out tended strongly to support the general verdict of the jury in favor of the defendant, and that under the universal ruling of this court in such circumstances this court is without authority to set the verdict aside.

We cannot agree with the majority opinion that the court's refusal to give the plaintiff's requested instruction No. 1 was reversible error, for the reason that such instruction was not called for in the form that the same was tendered, and took from the jury the issue constituting the sole defense of the defendant, and was, in effect, tantamount to telling the jury to find for the plaintiff.

This is a legal action, one in conversion, and the parties, under the Constitution and statutes of this state, were entitled to a jury trial as a matter of right. The evidence was more or less in conflict upon the one issue of fact made by the pleadings, and such issue was submitted to the jury under proper instruction from the court. The verdict of the jury was in favor of the defendant, upon which the trial court rendered judgment. The testimony of the defendant, supra, was insufficient to take the case to the jury, and, we think, amply supports the verdict.

We think the majority opinion overrules perhaps more than a thousand cases decided by this court holding that "when controverted questions of fact are submitted to the jury, and the evidence adduced is conflicting and contradictory, but there is competent evidence reasonably tending to support every material allegation necessary to uphold the verdict and the trial court approves the verdict and renders judgment in accordance therewith, and a new trial is refused, this court will not disturb the verdict of the jury and the judgment of the court on the weight of such conflicting evidence."

"Where the instructions given by the court fairly and reasonably present for the consideration of the jury the issues joined by the pleadings and presented by the evidence, they are sufficient." McMaster v. City National Bank of Lawton, 23 Okla. 550, 101 Pac. 1103.

That case followed the rule announced by the Territorial Supreme Court in Stickler v. Gitchel, 14 Okla. 523, 78 Pac. 94; Kuhl v. Supreme Lodge Select Knights and Ladies, 18 Okla. 383, 89 Pac. 1126; Everett v. Akins, Sheriff, 8 Okla. 184, 56 Pac. 1062; Archer et al. v. United States. 9 Okla. 569, 60 Pac. 268; Kramer v. Ewing, 10 Okla. 357, 61 Pac. 1064; Wade v. Cornish, 23 Okla. 40, 99 Pac. 643; and has been followed by this court without variableness or shadow of turning ever since.

If we are not mistaken in our conclusion that the one issue involved in the case was fairly submitted to the jury by the instructions of the court, and that the evidence in this case as set out. supra, reasonably tends to support the verdict of the jury, there is no escaping the conclusion that the judgment appealed from should be affirmed and that the majority opinion reversing the same is wrong.

### On Rehearing.

MILLER, J. The original opinion was handed down in this case on the 25th day of April, 1922, reversing and remanding it, and it now stands on petition of defendant in error to rehear. Numerous grounds are assigned for rehearing, but it will only be necessary to consider one, all the others having been raised in defendant in error's brief and fully considered by the court in its former opinion.

Defendant in error insists, in its petition for rehearing, that in no event should it be held liable for a conversion of the oil royalties of plaintiff in error produced during the months of June, July, August, and September, and up until October 15, 1915, for the reason that plaintiff in error did not notify defendant in error that he would not accept settlement for this period until after October 15th, and until after such royalties had been sold at the posted market price.

Oil was produced by the defendant in error on this land under its lease from plaintiff in error in September, 1914, and the first statement as to the oil produced, in so far as is disclosed by the record, was forwarded to plaintiff in error, accompanied

by a letter and check, on the 5th day of January, 1915, and covered the oil run for the months of October, November, and December, 1914. This arrangement continued up until the latter part of April, or the first of May, 1915, when production from this lease became very heavy approximating 20,000 barrels per day. Soon after this large production was developed, some, if not all, the oil proved to be what is called or known as "cut oil," which it was necessary to store and settle before it was marketable. Defendant sold all the oil produced from this lease, including plaintiff's royalty, to the Oklahoma Oil Company, at the market price, which was to be determined by the daily price posted by the Prairie Oil & Gas Company. This arrangement continued from about the 15th day of May, 1915, to the 17th day of August, 1915, when it, for some reason which does not appear in the record, was discontinued, and the defendant began to store the oil and sell it from storage as it had done before.

The Oklahoma Oil Company and the defendant were so interlocked that they were under the same general management, occupied the same office, with the same office force, and were headed and directed by practically the same, if not entirely the same, directorate, officials, and office heads.

Defendant continued to store the oil, including the royalty of plaintiff, and selling it from storage until January 1, 1916, when, in accordance with a demand from the plaintiff, it delivered his royalty to the pipe line of the North American Refining Company. Plaintiff knew that the defendant was selling his royalty and accepted payment for the same up to June, 1915, from which time no checks were accepted, though frequently tendered, and in accepting payment thought and believed that he was receiving the full market price for his royalty, and that, in each instance, he was only selling so many barrels of oil.

Plaintiff had no notice that defendant was asserting ownership to his royalty until about October 1, 1915, and on October 4th he wrote a letter to defendant and asked that the matter be taken up with the legal department of defendant, and, having received no reply, about October 15, 1915, he placed the matter in the hands of his counsel. On the 6th day of October, 1915, defendant forwarded to plaintiff a check covering his royalty for the months of June, July, August, and September, 1915, which was refused by plaintiff, for the reason that at that time he had received notice from defendant that it was claiming ownership of his royalty, which claim was repudiated on October 4, 1915, hence his decline to accept the check.

Prior to October 1, 1915, no word was ever spoken to plaintiff by any agent of defendant or other person. No check, voucher, statement, or letter was ever received by plaintiff from defendant that in the slightest intimated or would in any way indicate that the defendant was asserting ownership to his royalty and claiming a right of possession thereto, and to make disposition of the same.

In our view of this case, the only defense that is material to its decision is that of ownership of plaintiff's royalty. It is true that if at the time of the alleged conversion defendant was the owner of the royalty alleged to have been converted, plaintiff cannot recover. While plaintiff knew that defendant was taking his royalty up to May 15, 1915, and that from May 15, 1915, up to August 17, 1915, it had sold his royalty, together with all the oil produced from the lease, to the Oklahoma Oil Company, yet he did not know, nor was there anything to put him on notice or inquiry, that defendant was taking the royalty of the plaintiff as the oil of defendant, or that defendant had sold to the Oklahoma Oil Company plaintiff's royalty as defendant's oil.

Plaintiff, up to October 1, 1915, had no reason to suspect that his ownership and right of possession to his royalty was questioned or his right of dominion over it, or that defendant proposed to arbitrarily disregard him in its disposition and control.

In the conversation of defendant's officers with plaintiff in May and June, 1915, no claim is made that defendant had acquired his royalty, but it was explained to plaintiff that it was advisable to sell his royalty, together with all the other oil produced from the lease, to the Oklahoma Oil Company, as it had a large amount of empty storage, and was prepared to store the oil and settle it out that it might become marketable. These appear to be the only conversations had between plaintiff and defendant as to a disposition of plaintiff's oil.

When plaintiff learned that defendant was claiming to have acquired title to his royalty at the posted market price by the Prairie Oil & Gas Company, he immediately repudiated this claim, and there was due him at this time his royalty for the months of June, July, August, and September, which defendant had converted and appropriated

to its own use, and the contention of defendant that it should not be held to answer for the oil it converted that was produced during these months cannot be sustained.

The petition for rehearing is denied.

HARRISON, C. J., and KANE, KENNAMER, and NICHOLSON, JJ., concur.