**OKLAHOMA TAX COMMISSION,
Plaintiff in Error,**

v.

**SUN OIL COMPANY et al., Defendants in Error.**

**No. 43737.**

Supreme Court of Oklahoma.

July 27, 1971.

Rehearing Denied Nov. 2, 1971.

Albert D. Lynn, E. J. Armstrong, Mike Tapp, Oklahoma City, for plaintiff in error.

McAfee, Dudley, Taft, Cates & Mark, by Judson S. Woodruff, John B. Dudley, Oklahoma City, and William C. Phelps, Sun Oil Co., Tulsa, for defendants in error.

WILLIAMS, Justice:

Plaintiffs, defendants in error herein, filed suit in the trial court seeking the recovery of taxes paid under protest to plaintiff in error, Oklahoma Tax Commission, upon an assessment of additional gross production tax allegedly due on natural gas produced by plaintiffs and others not involved herein in the Laverne Field, in Oklahoma, and sold to Michigan Wisconsin Pipe Line Company (MW) under various gas-purchase contracts.

The Laverne Gas Field in Harper and Beaver Counties was first opened in approximately 1955. In 1956 MW began negotiations with several of the principal producers in the field for purchase of natural gas. At the time these negotiations were occurring, the field was not fully developed and the extent of the gas reserves recoverable therefrom was not known. The negotiations culminated in early 1957 in the execution of gas-purchase contracts. Subsequently, MW executed materially identical gas-purchase contracts with many other lessees-producers in the field.

In brief summary, these contracts provided MW would accept delivery of the purchased gas into their gathering system at the well site of each included well. The quantity and quality of the gas was to be measured and tested at this point of delivery, and for each thousand cubic feet (MCF) of gas measured MW agreed to pay 17¢ with the provision that for each additional British Thermal Unit (BTU) the purchased gas tested over 1000, but not exceeding 1200, it would pay a premium of .01¢. It was stipulated this was the highest price paid in the Laverne Field. In addition, the following language (or essentially the same language) was contained in each of the gas-purchase contracts:

"Both Seller and Buyer desire that the gas delivered to Buyer hereunder and from other sources in the Laverne Field be processed in a plant for the extraction of liquefiable hydrocarbons therefrom. Buyer and Seller therefore agree as follows: (a) Seller, either alone or in cooperation with others, shall construct and operate or cause to be constructed and operated without cost of expense to Buyer a gas products recovery plant on Buyer's lateral line into said field for the processing of said gas, and Seller further agrees that the processing of said gas shall be in accordance with all of the provisions of Exhibit 'B' attached hereto and hereby made a part hereof, said Exhibit 'B' being sometimes referred to herein as the 'Processing Agreement,' or (b) as an alternate to the obligation set forth in (a) above, Seller may arrange with another party or parties for the processing of Seller's gas in accordance with said Processing Agreement [which required that it be done in the above-mentioned plant], or (c) if Seller within six (6) months from the date it executes this gas purchase agreement, does not notify Buyer of Seller's election to process or

have processed its gas under (a) or (b) above, then all rights to process Seller's gas sold hereunder for the extraction of liquefiable hydrocarbons at the expiration of said six (6) months period shall pass to and vest in Buyer."

Many of the lessee-producers exercised the above quoted contractual right to process for the extraction of liquefiable hydrocarbons the gas they produced. Other producers assigned their right, while still others did not either exercise or assign the processing right. In the latter event, the right vested in MW and pursuant to the processing agreements entered into, MW conveyed these rights to those who had elected to process and had become plant owners.

The gas processing plant built by the producers who had elected to process the natural gas was completed on MW's pipeline system in the Laverne Field in 1959. Prior to the plant's completion, MW accepted delivery of the contracted gas in the Laverne Field and paid therefor only the contractual price per MCF plus the applicable premium for the excess BTU content. After completion of the processing plant, in the event of plant breakdown, etc., MW continued to accept delivery of the natural gas, diverted it around the plant, and again paid the producers only the contractual price per MCF of gas plus the applicable BTU premium.

In accordance with the processing agreements, plant owners reimbursed MW for reduction in the volume and BTU content of the natural gas after it had been processed in the plant and redelivered to MW.

In 1967, the Tax Commission levied the additional assessment involved herein against the various producers who had elected to process the gas and who had therefore become plant owners. This assessment was based upon the gross value received from the sale of the liquid hydrocarbons extracted less the amounts paid MW for the reduction in volume and BTU content of the processed natural gas. It

was, and is, the Tax Commission's contention that the reservation of the right to process represented an additional value which, for gross production tax purposes, must be added to the contractual price paid for the gas at the point of delivery, measurement and testing. It was agreed MW had paid all gross production tax amounts due on the contractual price per MCF plus the BTU premium adjustment.

As earlier stated, plaintiffs paid the additional assessment under protest and brought suit for its recovery in the trial court. The trial court found the additional assessment invalid and entered judgment for plaintiffs. From this judgment, the Tax Commission appeals.

This state's gross production tax is levied by the provisions of § 1001, subsection (a), of the 1963 "Oklahoma Gross Production Tax Code" (68 O.S.1963–1970 Supps. § 1001 (a)). In relevant part, that subsection provides:

"Every person, firm, association or corporation engaged in the * * * production, within this State, of * * * petroleum or other crude oil or other mineral oil, natural gas and/or casinghead gas shall, monthly, file with the Tax Commission, a statement under oath, on forms prescribed by it, showing the location of each * * * oil or gas well operated or controlled by such person, firm, corporation or association during the last preceding monthly period; the kind of such * * * oil or gas produced; the gross amount thereof produced; and *the actual cash value thereof at the time and place of production, including any and all premiums received from the sale thereof;* the amount of royalty payable thereon; * * * and shall, at the same time pay to the Tax Commission * * * a tax equal to five per centum of *the gross value of the production of petroleum or other crude or mineral oil* which is hereby levied . . . and a tax equal to five per centum of *the gross value of the production of natural gas and/or casing-*

*head gas,* which is hereby levied. * * *" (Emphasis added).

In determining when oil is produced for gross production taxation purposes, this Court, in Sinclair Prairie Oil Co. v. State, 175 Okl. 289, 53 P.2d 221, 223 (1935), stated:

"* * * Oil may be said to be produced for gross production taxation purposes within the meaning of the statute when it is brought to the surface and confined in such a manner as to permit its measurement as to quantity and its testing as to value."

Also see Atlantic Refining Co. v. Oklahoma Tax Commission, Okl., 360 P.2d 826 (1959).

In In re Home-Stake Production Co., Okl., 463 P.2d 983 (1969), this Court, in effect, held that lacking evidence establishing gas produced was incapable of being measured and tested before passing into a pipeline, the gas was produced for gross production taxation purposes after passing through a dehydrator at the well site, even though the gas was not measured and tested at this point.

In the instant case, the gas was measured and tested "at the time and place of production" at each well site after passing through a separator. MW paid each producer the contractual price plus BTU premium adjustment based upon measurement and testing data reflected at the well site. In our opinion, absent evidence tending to establish the contractual price was less than that paid for other gas of similar quality in the field, the natural gas was produced for gross production taxation purposes at the time it was measured as to quantity and tested as to quality at the time and place of production. As noted above, the parties involved herein stipulated the contractual price paid by MW was the highest paid in the Laverne Field.

As authority for their contention the gas must be followed downstream where the contractual price paid at point of delivery, measurement and testing allegedly does not reflect the actual cash value at time and place of production, the Tax Commission cites Katschor v. Eason Oil Co., 178 Okl. 634, 63 P.2d 977 (1936); Cimarron Utilities Co. v. Safranko, 187 Okl. 86, 101 P.2d 258 (1940); and, Matzen v. Hugoton Production Co., 182 Kan. 456, 321 P.2d 576 (1958). However, these cases deal with factors to be used in determining royalty to be paid, not factors involved in determinging the amount of gross production tax due, and are therefore distinguishable.

The judgment of the trial court is affirmed.

BERRY, C. J., DAVISON, V. C. J., and JACKSON and McINERNEY, JJ., concur.

BLACKBIRD and LAVENDER, JJ., concur in result.

HODGES, J., dissents.